I'd like to reserve three minutes and also take up my motion on rebuttal. May it please the Court, I'm Ahilan Arulanam from the ACLU of Southern California, with me is Judy Rabinowitz. She's Senior Staff Counsel at the National ACLU Immigrants' Rights Project in New York. We represent the petitioner, Ahilan Nadarajah. To rule for the government and uphold the four-and-a-half-year detention of my client, a torture victim from Sri Lanka, in this case, the Court would have to do three extraordinary things. First, it would have to construe a general detention statute to authorize indefinite detention, and ignore clear congressional statutes that specifically authorize prolonged detention on national security grounds but which don't apply here. Second, this Court would have to disregard the canon of constitutional avoidance and reach out to decide a complex question of constitutional immigration law. And finally, this Court would have to embrace the allegations against my client, even though the government's own immigration courts have repeatedly rejected those allegations. Now, turning to the first point, Your Honor, Congress has provided ample authority to detain on national security grounds in two different statutes, but it's required some procedural protections that accompany that detention. And this reflects a common-sense idea. If we're going to lock people up for years without trial, there ought to be some procedures in place. Now, just last year, in Clark v. Martinez, the Supreme Court considered a general detention statute and found it insufficient to authorize indefinite detention. And the Supreme Court looked to those same specific statutes and contrasted them and said, the detention of alien terrorists is a special arrangement authorized by a different statute. We just asked this Court to do here what the Supreme Court did in Clark. Now, there's no dispute that my client's removal is not reasonably foreseeable. He's a torture victim. There's no dispute about that. In fact, the cigarette marks are still visible on his body, as the psychiatric report notes. I think it's ER 18 to 20. And he has an unappealed grant of relief under the Convention Against Torture from the immigration judge. In fact, the judge asked the government what its position was, and the government declined to contest it, didn't contest it on appeal. So we know what's going to happen. He can't be removed to Sri Lanka. There's no other country that can take him. And there's no other country where he's ever lived. So his position is very similar, Your Honors, to the position of the petitioner in Lye v. Hansen. There, Judge Boggs, writing for the Sixth Circuit, said that if a person can't be removed to another country, in that case, Vietnam, then his removal is not reasonably foreseeable, and he is entitled to release under Zet Vitis, even though he's continuing to litigate his immigration case. I take it you are not questioning the right of the immigration authorities to condition his release upon adequate terms and conditions? No, Your Honor. We are not. And what were the terms and conditions attached to the $20,000 bond that was initially set back in, I guess it was 2001? I don't recall the precise terms, but there was nothing particularly objectionable about those conditions, Your Honor. The only issue really is, obviously, if the bond were set so high that it was impossible for the person to pay it, that might be an issue. There's actually cases that I didn't cite in my brief, but this Court's decision in Doane v. INS makes the point that, obviously, if the bond were too high, that would be a problem. The Fifth Circuit has decided that question also in the Shokay case, which I'm happy to share with the Court. If it's an issue that arises, it's not an issue in this case because we don't have a bond order. In fact, we tried to pay the bond order back in September of 2004, and the government refused to take the money and then issued a new decision saying we're actually detaining him without a bond. Yes. I assume that you'd still be willing, ready, and able to pay the bond or meet other conditions of ---- Yes, Your Honor, absolutely. And as we made clear in the motion, he would be willing to pay a substantial bond. He would also be willing to submit to electronic monitoring, which was not part of the original conditions. We don't think that those things should be an issue in this case because he's not a flight risk, but we certainly would be willing to accept reasonable conditions of release, Your Honor. I think the other thing which makes this case ---- Who sets those conditions of release? Is it the immigration judge or is it the district director of DHS? Well, under the regulations and the statute as the government has interpreted it, it would be the district director. I think if this Court ruled that there was no statutory authority to detain him, it would be to the district director to set those conditions. In other cases where ---- well, the regulations are divided so that sometimes the immigration judge is entitled to set those, sometimes the district director. The way this case works, because it's an inadmissible alien, it's the district director. And would your position be that if we granted habeas relief, that it could be conditioned upon the granting of a reasonable bond on terms and conditions, and that the district court would retain jurisdiction to oversee the question of reasonableness as set by the district director? Yes, Your Honor. I think the district court could retain that jurisdiction. I think this Court would also have the authority to retain that jurisdiction. Well, we're not usually in the business of setting terms and conditions of release. That's what our district judges do. But I guess my question really is one of power under once the great writ is issued, does a federal district court have inherent power under the habeas corpus statute to do what I've suggested? Yes, Your Honor. The great writ is meant to be a flexible remedy. The cases that we cite in the motion, I think both just general habeas cases outside the immigration context, like In re Roe, and also the specific cases. I think the leading cases from the Second Circuit, it's Mapp v. Reno. Judge Calabresi's opinion makes clear, analyzes the history of immigration detention authority and makes clear that the district court has the authority to admit the petitioner to bail. I think it's not different, really, from what lots of habeas petitions in the immigration context have done over the last 10 years or so, since 1996. But I do think that if the Court is inclined to do that, we would really request that there be a strict time limit imposed on the relief and say the district court has to issue, the district director would have to issue those release conditions or the district court would have to oversee them subject to something like, I don't know, I don't want to speak for the, you know, to impose upon the court's authority, but something like, I don't know, 2 weeks or 30 days or something like that. Well, you're raising the follow-up question, and that is, assuming that we were to order a grant of habeas relief and a release on reasonable terms and conditions, what does the law provide with regard to an adjudication of the underlying immigration case? As I understand it, there is no provision in the regulations that sets a time limit on when the attorney general must decide the question that has now been certified to the chairperson of the Board of Immigration Appeals. So are you asking us to order a judicial time limit in the absence of regulation or statute by which the attorney general must issue his decision? No, Your Honor. In this case, when we're talking about the remedy that we're discussing now, you're absolutely correct that there's no time period, and I don't think that the appropriate course would be for this Court to impose that time period. Instead, I think what the Court should say — actually, let me back up for one second. The first question, as you rightly point out, there's no timetable for the attorney general to decide. We all know the attorney general is a busy man. It might take a long time. Apart from that, Your Honor, the attorney general may just order a remand, and that's what the Board of Immigration Appeals did. And under the government's theory of the case, he can be held, even if it's only being a remand only for background checks or for some other trivial purpose. So let's say the attorney general decides in our favor, but remands or remands to apply a different legal standard, or who knows what could happen. He'd still be detained during all that time. Well, I'm assuming that we're going to — that we would be ordering — in our hypothetical, we would be ordering his release. But I guess where I'm really going is what happens to the underlying immigration case. It's not clear to me in reading the Supreme Court decisions what is contemplated that must occur. Is there a six-month review? And if so, by whom? Who does what with regard to these ongoing immigration cases? With respect to the underlying immigration case, I don't believe there is — if I'm understanding your question right, there — I don't think there is any authority about how long those cases have to take. It's only about how long the people can be detained while those cases go on. All right. So if we were not to order him released, then those cases would require periodic reviews no longer than every six months. Right, under the national security detention statutes. But I think if — and I apologize if I've — I don't know how long the attorney general can take or how long the whole process can take on remand. If we lose, we will seek relief in this court, just like the cases you heard this morning, right? Petition for review as any other normal. Right, petitions for review. And through that whole process, if this court has ordered his release, then he would remain out on those conditions that you've described through that process. And if he ultimately loses, and if somehow it's determined that there is some country that he can go to, then he could be, you know, re-detained then. But if there isn't and he wins, then he should remain out. And that's all the relief that we seek, Your Honor. It's hard to take a petition for review when you win. Yes, Your Honor. That's true. And that's — Well, in that circumstance, you've won now twice before the immigration judge, twice before the Board of Immigration Appeals. If your client remains in detention, do you have any other remedy but habeas corpus? No. We have no remedy, Your Honor. We have no remedy. And if the attorney general remands and he's kept in detention, we have no remedy. This is the only thing that we can do. And, Your Honor, I guess I want to talk about the delay in this case and how it, I think, is relevant to this question about the remedy, because now I think four — I want to say there's at least four opinions. There's Judge Boggs' decision in lie. There's Judge Beezer's decision sitting for the Fourth Circuit in Welch v. Ashcroft. There's the dissent in the Tijani case from Judge Callahan. And there's Justice Kennedy's concurrence in Kim. All of those cases say that if the delay is long, if the delay is unreasonable, then that may make the detention — either may or, in some of the cases, says does make the detention unauthorized by statute. And just so we're clear, the delay in our case dwarfs the delay in all of those cases. It's 18 months in lie. It's 14 months in Welch v. Ashcroft. And here it's just much longer. It's 30 months in this court's decision in Tijani. Here it's — I think it's 52 today. It's 52 and 8 days or something like that today. So I do think that this case is extraordinary. And I think that this court can rule that in this case the delay is excessive, particularly where the petitioner cannot be removed to Sri Lanka. And for that reason, this case is fairly sui generis, I think. And it doesn't necessarily require a broad ruling that addresses, you know, all of detention pending removal or something like that. I think if the court has no more questions about the statute, I could turn to the question of facially legitimate and bona fide. To be clear, we have two distinct ways in which the court could rule for us. One way is that the statute doesn't authorize prolonged detention, at least where there's delay and the alien can't be removed. If the court doesn't accept that argument, our sort of backup argument, I guess, is even if the government is correct, there's no doubt that this is just reviewable for facially legitimate and bona fide reasons. And the statute does authorize detention where that is at stake. We don't have facially legitimate and bona fide reasons here. The government's own brief concedes that there has to be some reasonably reliable evidence in the record. You know, and that reflects the historical habeas corpus doctrine. We cite Professor Newman's article in our briefs, which makes clear that there's some, there's some evidence in the record, there's something to base this on. And here there really isn't anything. I mean, nobody in our government can vouch for the reliability of the allegations against my client. You know, I asked the agent this precise question. The agent didn't know if the informant had personal knowledge of the allegations or if instead it had come from somewhere else. He didn't even ask. So there really is no evidence at all on which to base the case on. The government, I think, misreads the immigration judge's decision. And this is, I think, important. The immigration judge found the agent credible. And I attack the agent's credibility for a variety of reasons that I don't think we have to go into here. But I attack the agent's credibility. And the immigration judge said, no, I find the agent credible. However, that being said, the information that the agent was accurately conveying, according to the judge, is a different question. It's a different issue. And that goes to the credibility of the informant. Well, it's sort of the standard two-step Aguilar-Spinelli analysis, is it not, from criminal cases where we look at the veracity of the information that is supplied and, secondly, the reliability or track record of the informant. I'm not familiar with the criminal doctrine. That's okay. You're an immigration lawyer. I understand that. It's bad, though, because I used to be a criminal lawyer. I really ought to know that. I won't hold that against you or your client. But, Your Honor, I do think that there is definitely a two-step approach here. And the agent, the judge, found reliable and credible, rejecting my arguments about that. But the underlying informant, he found not to be credible. I think it's also marked as Exhibit 10. And in that, there's a paragraph that begins where the court talks about the testimony of Special Agent Schultz. And at the bottom of that page, the immigration judge said, Special Agent Schultz emphasized that the Canadian authorities have vouched for the reliability of, quote, the asset, end quote, presumably the informant, and that Schultz himself had previously verified some of the data given to him by the informant. Schultz testified that he had no reason to doubt the veracity of the source. The Court finds his testimony to be credible. Having said that, however, Schultz's testimony regarding the unquestioned reliability of the information provided by the informant is not undisputed. Is that the portion of the record that you're referring to? Yes, Your Honor. That's precisely the portion I'm referring to. And to be clear, the information that Agent Schultz was able to verify from the informant allegedly independently, and I want to be perfectly clear, I don't think the Court needs to delve into all of this to find, because the immigration judge and the board have now agreed with sort of my account of this information, right? All had to do, the information that was verified, all had to do with the smuggling route in this case. And my client admitted and the immigration judge accepted that my client's initial statements about the smuggling route, he was scared by what the smugglers, they sort of threatened him and said, don't reveal the smuggling route. And the informant was able to verify that. But the informant was completely wrong about everything else involving my client, including where he was from. And this was a critical fact, because if my client is not from a terrorist-held part of Sri Lanka, an LPTE-held part of Sri Lanka, then it's not true that he has to be in league with them in order to get out of Sri Lanka. And we did it with maps, and we had an expert who consults with the State Department, and we looked at it, and it was perfectly clear. He said, this is one of the most heavily government-fortified parts of the island in the whole country. So I think what it suggested to me was that the informant, and the immigration judge said, this is a possibility, that the informant is somehow tied to the smuggling network. And I don't think that you have to decide what's the case, but I think you can say where the informant is objectively wrong about the place where he's from, also about this phone call, which the judge didn't talk about in his decision, but I think was very important. The informant said that my client had, with another person, made a phone call and threatened some third person. Threatened some third person? I understood the record to be that it was alleged that your client had made a telephone call while in custody to Canada, either engaging in a conversation about a murder or directing that such a murder occur, and that the victim of the murder was the informant himself. Did I misread that? Well, I don't think actually that you could tell. Well, certainly you can tell from the reports, and I don't think that you can tell that the victim is the informant himself. If you read the record, as I read the record and as I remember it, I don't think that was the testimony. So the allegation was there was an alleged conspiracy to murder somebody in Canada, but that's about as specific as it got. That's right. And this was important because it wasn't clear that the informant, again, had personal knowledge, which of course he would have had if he were the recipient of the phone call, right? But the person with whom my client is supposed to have made this call is a woman. She was detained at the same time in the same facility. It is gender segregated. They don't meet in the same rooms. They can't make phone calls together. You can't even make a three-way phone call from that detention center. I know I've tried. And so, Your Honor, there's just no basis for the allegation. It's simply false.  And we took this whole thing into account and said, I just don't believe it. And we know that if there was a serious terrorism threat arising from this case, an immigration judge is not going to lightly disregard that. And I think it's important, then, that this Court recognize that here we don't even have facially legitimate and bona fide evidence. I'll reserve the rest of my time, which actually I think is less than I had originally reserved. Roberts. It has expired, but we'll give you a couple minutes for rebuttal. Thank you, Your Honor. We'll hear from the government. Mr. Fuller. Thank you, Your Honor. And may it please the Court, Chris Fuller representing all of the respondents who were named in the petition for writ of habeas corpus. And although I don't know whether this is appropriate or not, but I wish to extend a welcome to Judge Fitzgerald into the strange world of immigration law, my commiserations. But let me, if I can, first, Your Honors, talk first about the forest before I get into the trees, because I think this is very important. And it is partly in response to the introduction by opposing counsel. And that is that ultimately the point here is that an alien's status matters. The entire immigration law and the jurisprudence attached to it depends upon an alien's status. It goes from lawful permanent resident on the one end all the way down to an arriving on the door basically trying to get into the country, uninvited, without papers, et cetera, and their status all the way through this. With respect to this particular case in detention authority, Congress has established three separate statutory schemes for the detention of aliens, all geared specifically to an alien's particular status. And the case law is instructive with regard to this case, and I'd like to talk about that briefly. Those three basic schemes are the one that we have at stake here, and that's INA Section 235, 1225, which deals with arriving aliens. The other is a 236 case, which the Supreme Court addressed in DeMoor v. Kim, dealing with aliens in proceedings who may have statutory, for example, committed aggravated felonies, et cetera. And the final one is the detention authority for aliens who have received a final order of removal in 8 U.S.C. 1231. Now, the case law with regard to that statutory gram, Zadvydas, Clark v. Martinez, deals with aliens who have, in fact, been found finally removable. They have a final removal order. And what Congress has done in 1996, they separated the old deportable alien and excludable alien and made them removable. And then in Section 241, in this 1231 post-final order removal detention authority, lumped them all together, and hence their status changes. And thus, based on that status, the Court then interpreted in Zadvydas and Clark v. Martinez the limits of the detention authority that, particularly with regard to what we now call another acronym, excuse that, SLRF, significant likelihood of removal in the reasonably foreseeable future. Roberts. Yes. Well, I understand that. Now, that's all there. No. Let me ask. May I just cut ahead a little bit? I understand the difference. And the Supreme Court was careful to say that its rulings were not extended into this category. But what makes you think that, given what the Supreme Court has said about this and its SLRF rulings or whatever you want to say, that it would not extend some form of this to aliens who are in this situation? Well, and the key to that analysis, Judge, is Damore v. Kim. Because there, with aliens in a different status, not yet having a final removal order, the Supreme Court did not mention the reasonableness interpretation of the statute as they did in Zadvydas and Clark v. Martinez, instead went to the authority with regard to the distinct, unique circumstance of an alien, in this case a lawful permanent resident, who was in proceedings and did not yet have a final removal order. And the Supreme Court did not mention the reasonableness interpretation of the statute as they did in Zadvydas and Clark v. Martinez, instead went to the authority with regard to the distinct, unique circumstance of an alien, in this case a lawful permanent resident, who was in proceedings and did not yet have a final removal order. And the Supreme Court did not mention the reasonableness interpretation of the statute as they did in Zadvydas and Clark v. Martinez, instead went to the authority with regard to the distinct, unique circumstance of an alien, in this case a lawful permanent resident, who was in proceedings and did not yet have a final removal order. And the Supreme Court did not mention the reasonableness interpretation of the statute as they did in Zadvydas and Clark v. Martinez, instead went to the authority with regard to the distinct, unique circumstance of an alien, in this case a lawful permanent resident, who was in proceedings and did not yet have a final removal order. And the Supreme Court did not, as Natarajah tries to infer, restrict either its holding or its reasoning to those cases where detention falls within the average or median length of time. So far, so good. Of course, of necessity, by referring to average and median detention times, the Court implicitly acknowledged that there would be shorter than average and longer than average detentions, and its approval of the average and median necessarily covers the short and long detentions that go into the mathematical equation to what it says is you can never have and that the government can detain somebody indefinitely, under your theory, because you're saying whatever the number falls on the scale, the Court was envisioning that. And I don't take that away from Dunmore at all. They talk about brief detentions there. No, they talk about detentions that are definite. Yes. And they define definite, not by the length of time. Yes. But by the circumstances in which the alien is placed. Okay. In which, if I can make that point before you go, and that is that he has a proceeding that has an end. Okay. Now, here we are at this proceeding, taking your point. He has been before the IJ twice, won in front of the BIA twice. Normally, the proceeding would be at an end there. And if I was reviewing your statistics today on the grant of conventioning as torture relief, and I believe last year there were 33,000, some 600 applications for relief on the convention against torture. Of those, about 460 were granted, about 2%. So he's been awarded relief from the Department of Justice that 98% of the people don't get. When do you think this is reasonably foreseeable that he's not going to be removed? Well, the removal to Sri Lanka, because of the CAT claim, is foreclosed unless challenged or reopened. Yes. Okay. But Section 1231 of the INA creates a detailed process that must go through, that DHS must go through, to find alternative countries that could, in fact, be available. And that process doesn't trigger until a final order of removal kicks in. But there is not going to be a final order of removal because he's won relief. No, no. Let's make a distinction here, Your Honor, and I don't mean to belabor the point. But CAT claim only protects removal to Sri Lanka, not to any other country. And, in fact, the regulations articulate in 1208.17 that, in fact, it puts the alien on notice. Even if you get CAT protection to a particular country, we may remove you to an alternative country if, in fact, we can find those pursuant to the statutory scheme in 1231. My point in mentioning CAT was because that relief is so rare. He also obtained Sion relief and so forth. So when do you think it's reasonably foreseeable that he's going to be removed? Well, that's the determination of DHS. After they've actually had a final order, he may still be victorious with the Attorney General and the board. But what if the Attorney General takes 10 years to decide? That's okay? That's still not an issue? Let me finish my question. Counsel. Counsel. Let me finish my question. Let Judge Tolman finish. Does that still constitute no indefinite detention under the government's view of Damore? Based on the definition in Damore v. Kim, yes. Because Damore v. Kim could be 10 years. It could be 20 years. You think that's constitutionally and statutorily permissible. Well, let's address that very point then. And that point comes to where does an arriving alien obtain the constitutional protections with regard to this point? If, in fact, he's not an alien who has a final removal order that can be executed and, hence, through that process, determine whether or not there are alternative countries to send him to. If he is in process, where does this alien get the constitutional right to say, my due process rights are now violated because of the length of my detention? What you're doing is taking jurisprudence that's been uniquely woven into a status of an alien post-final order and saying that can bleed down into other status, into other circumstances. And that has never been done by the Supreme Court. And ultimately, it's never been done by any court other than one who says the status doesn't matter because we're so upset by the length of detention and the potential, the hypothetical potential that may, in fact, sound to us to be horrible. And it is horrific. I can't imagine being detained for four years, four months. It's a long time. But ultimately, he's an arriving alien who came to this country without invitation and has no right to enter. And that's clear in the constitutional jurisprudence. How many attorneys get to stand in front of you and say, I have 110 years of Supreme Court jurisprudence standing on my side here with regard to his constitutional rights? That doesn't happen very often, but I can say it here unequivocally. And it's been renewed as late as Zadvitas by the Supreme Court. He has no constitutional rights. It has to spring forward somewhere from someplace. And what they're trying to do is take it from the post-final order removal cases and bleed it down in. And that means that status doesn't matter anymore. If I understand the government's position correctly, the only process to which the alien is due here is whatever Congress has provided. There is no general due process right to be detained for an unknown and unknowable period of time, no matter how long he's held. Well, you know, I go back to DeMoor versus Kim and the indefiniteness. And ultimately, I'm not saying that he can be held indefinitely. There has to be an end to the process. Okay? Well, that's kind of what we're here for. When do you contemplate the end of this process? Well, I think it's going to be released tomorrow, because that's within the discretion of the field office director and DHS. Yes, he could be. Or ten years. Well, there's never been a case. Actually, we have some cases in this jurisdiction, unless they're 17 years old but their aliens are not detained. I believe the political pressures involved in the political nature of these detentions would, of course, refrain or restrain the secretary of DHS from retaining someone, unless, in fact, they've got some significant findings that there are national security risks at stake. And that gets reviewed pursuant to habeas corpus review in appropriate ways. Of course, it's outlandish to suggest someone would go on for ten years. I'm just suggesting that someplace, somewhere, there has to be a constitutional right that gets generated for this type of alien. And right now, the case law is not there. And what we have to rely on, ultimately, is that the discretionary authority granted by Congress to detain these arriving aliens and for the burden that these aliens have on them to show an urgent humanitarian reason or a significant public benefit for their release, and if there's no national security danger or community danger, that they're still in the exercise of discretion. And that's the law in this circuit as per Wong, cited by the district court judge, although it was in a Bivens case action, saying that there is no liberty, interest, substantive or due process-wise, in an alien's right with regard to parole, whether it's granted, denied or revoked. Now, so we have to talk about- Breyer, why can't you release them under some sort of reasonable restriction? Yes, of course. In fact- Well, I know that you can, but why don't you do it? Well, I can say this without violating confidences. In fact, we've been consulting and negotiating with Mr. Nataraj's counsel to do that very thing, mainly because there are, in fact, pressures being brought to bear with regard to a lengthy detention. Yes, here you are. And the process is going on. Here you are, at oral argument. Here I am at oral argument, yes, because I don't have the discretion to grant parole no more than you do. Ultimately, you have the habeas power, but ultimately to grant a habeas petition you've got to find a legal violation or a constitutional one. Okay? And my question keeps coming back to the case law and in this jurisdiction, there's no constitutional right that attaches to this alien. So let's talk about the statutory right of detention. You're basing this purely on the general detention statutes that attach to aliens arriving in the United States that are not admitted, right? And the parole authority. And the parole authority. Yes. Why do you think Congress would put a stronger, put more restrictions on those whom they consider to be alien terrorists than the people arriving every day in the United States? Why shouldn't the specific statutes involved in the Patriot Act and other statutes that refer to that and refer to attorney general certification and the six months of reporting requirement control over the general statutes? Well, I'm not sure that they're apples and oranges. I do think that ultimately if the attorney general or the secretary of homeland security finds an alien that he believes to be a danger to national security pursuant to the statute and can, in fact, certify that alien as such. Sure. But there are strict requirements. The attorney general or his delegate has to certify, and every six months has to provide some evidence of why the detention should be continued. Why would Congress put those requirements on those, for those people arriving in the United States, whether they're in bezzling national security risk, all of those people in that category, and then say, but for the general person who's arriving here from Mexico or whatever, you can keep them as long as you want to with that reporting. Does that make any sense if we're trying to construe the statute as an organic whole? It does because 236 big A, which is the 12th, I forget the 8 U.S.C. citation, but INA section 236 capital A that grants the attorney general the authority to do this. It allows for indefinite detention. And an arriving alien put in proceedings, he's being held until his proceedings are resolved. That's the statute I've cited. Indeed, the district court cited it. Until his claim is resolved, there is not indefinite. 236 capital A allows for indefinite detention as long as the attorney general certifies and has reasons to believe that he is in fact a danger to national security, hence the protocols and protections, because it is indefinite. But the statute then provides the attorney general, I guess, with the discretionary authority to release the alien on terms and conditions, even though it is still technically detention, correct? Well, under General Habeas Law, there are certain restrictions still means that he's in a form of detention. Basically, an alien who is paroled who is not yet an arriving alien, he has to be, has to appear for his proceedings. And if, in fact, he's been ordered removed, he has to be removed. Right. And he can be revoked if he doesn't abide by the terms and conditions of his release. Which is what Wong in this case, in this Court decided in 2004 that said there are certain circumstances that arise. If, in fact, the district court judge is going to be the new FOD, the field office director, and order his release, does if, in fact, circumstances change, is Eich now to report to the district court judge to say revoke his parole? Basically, you're placing the judiciary in the place of what Congress has given to the Secretary of Homeland Security. Yes, but you're basically asking for unfettered discretion in that, in the exercise of that parole jurisdiction. I realize that that has been delegated to the executive, but, in fact, you don't detain many people when they come into the United States. About 13% of those. That's right. About 13% get detained. That's right. Most of those detentions, even according to the Supreme Court, last about a month, maybe as long as six months. And now we have almost five years here. What check is there on the executive under your theory for prolonged and definite detentions of these aliens in this situation? Well, I keep coming back. It's prolonged, yes, but not indefinite. And, indeed, prolonged is he brings habeas actions, and, ultimately, it's not unfettered. There has to be a facially legitimate and bona fide basis for that rejection. And it does bring focus onto the dilemma post-9-11 when there are allegations of association with, affiliation with, recognized and designated foreign terrorist organizations. It's a delicate dilemma for these field office directors to make this parole decision. It's very difficult. In this circumstance, we've got credible evidence, cited quotations from the record from Judge Tolman with regard to the circumstances of the testimony about this person's decision. Which has now been rejected by four times. Ultimately, however, just as in a criminal case, acquittal of a criminal charge does not mean that there was no prima facie evidence to proceed, nor does it mean that there was no probable cause to arrest. It's a different standard. In this circumstance, the judge applied regulatory authority to say the DHS opposed asylum, saying that he was an alien who had provided material support to Tommy O'Tigers. The rebuttable evidence had to come by preponderance of an evidence to say, no, he's not. And the judge found preponderance of evidence, even though the evidence was credible, said that by preponderance of evidence, no, I outweigh that. I don't think the judge said the evidence was credible. He said that the testifying officer testified truthfully. And what the testifying officer testified to was that he didn't know the informant. He had some ancillary dealings. He got his information third-hand from a Mountie and an anonymous letter. And none of those could be probed. And, in fact, when they were probed on cross-examination, I would say that the officer showed a startling lack of any information that was relevant to this particular applicant. Well, certainly if we were here to argue substantial evidence in support of it, the ultimate concern was the fact that the testifying officer testified truthfully. Well, no, you raised the issue. That's why I'm asking the question. Pardon me? You raised the issue. Well, I understand that. What I'm saying is that, ultimately, you make it the determination by the immigration judge that the expert testimony outweighed the ICE agent's testimony is not outcome determinative with respect to whether or not there's grounds to deny parole. Let me make sure I understand what you're saying. As I understand what you just said, it is sufficient for the field office director to simply say, I am detaining him because I believe he is a threat to the community based upon the informant's report, and that we, as a reviewing court on habeas, cannot look beyond the simple recitation of that reason, the facial reason, in order to determine whether or not there's evidence sufficient to justify. Well, there have been different courts talk about what facially legitimate bona fide means, and I cited in my brief to a case out of the Eastern District of Virginia, Haddam. Judge Ellis ruled in that case that it's facially legitimate and bona fide and found in some aspect of the record. And hence, what you've got is basically a review process to look at. We've had FODs issue parole denials and simply said, I deny parole. Well, there's no articulation of the reasons. There's no discussion of what goes on there. In this case, he said, this alien has failed to provide urgent humanitarian reasons. This alien has failed to provide us with the significant public benefit in his release. Plus, I've got an ICE agent who, as you quoted from the record, sincerely believed that the source information was legit and solid and proved in past circumstances, and that this was a national security circumstance with a guy that could, in addition, have made a threat. These were circumstances where an ICE agent believed it. The evidence may have outweighed it, but nonetheless, it was still grounds to say, look, are we going to put a guy out into the public domain that has these circumstances when he has not otherwise proved eligible for parole? And so that would be the bona fide prong of the two-prong inquiry. Is it facially legitimate? And did the special agent who proffered it have a bona fide good faith belief that it was true? When we deal with national security, the answer to that is yes. But we're talking about national security, but the Tamil Tigers really are a different risk than our ones we think about in terms of risks to our national security. The threat was based in Canada, if anything, to people in Toronto. There's nothing – there's no allegation that he was coming to the United States to cause harm here or a threat to our government, ever. Let's say that his threat actually happened, Your Honor. I'm not saying that. We don't know for sure. I'm just saying there's no allegation that he came to the United States to commit a terrorist activity against the government or people of the United States, right? That's right, but that's not the basis for determining he's a threat to national security, the purpose for which he comes. What if he comes and gets recruited? What if he comes and actually joins up with an LTTE group? Those are circumstances that are delicate and balancing, requiring ultimately the executive branch's expertise. Now, granted this – I'm not here to justify a four-and-a-half-year detention and go on for years. Ultimately, political pressures have to be brought to bear, but that's for the executive branch to determine. If he has no constitutional claim, Your Honors, you can't create one out of whole cloth. And it's improper, based on Supreme Court jurisprudence, to bleed the status jurisprudence for post-final order analysis, reasonableness with regard to indefiniteness, back into at the fore extreme an arriving alien. There simply is no jurisprudential grounds to do so. And ultimately, although this may not upset the apple cart with regard to the nature of the status of an alien, this is a very important case with regard to keeping the status of aliens throughout the immigration law and jurisprudence sound and recognizing that it actually plays into this analysis. If, in fact, it doesn't matter what his status is, then it doesn't matter whether or not he has a visa. Let him in. It doesn't matter whether his marriage was bona fide or fraudulent. Let him go. Give him a benefit. It doesn't – This isn't about that at all. No, but ultimately – That's a parade of horribles. It has nothing to do with this case. He was stopped. He was detained. The question is, is this detention lawful in the statute of the Constitution? Yes. It's not whether or not we're going to let people come in. But it matters with regard to whether or not you take jurisprudence for a – We understand the difference in the analysis. Okay. So I don't think you need to – I don't think you need to – Okay. Let me talk a little bit about the trees. Ultimately, with regard to the Constitution – You're over your time now, so please summarize in the next minute. Okay. The constitutional avoidance doctrine was not raised to the district court. That can't be considered here. They didn't raise it to the district courts too late now. Ultimately, here, I got a – we have a – the government has 100 years of jurisprudence on its side to say that an arriving alien has no constitutional right, no liberty, interest, substantive or otherwise, in his parole. And ultimately, this Court's review is the review the district court did, facially legitimate and bona fide, supported by evidence in the record that, in fact, supports the decision to deny parole. It's discretionary. It's within the authority of the Attorney General, now the Secretary of Homeland Security. And in this case, there is no constitutional statutory basis to find the denial of the district court – the district court's denial of the petition for rid of habeas corpus unlawful. Thank you, counsel. I'll allow the government four extra minutes, so we'll give you four extra minutes. Thank you, Your Honor. Six things. With respect to this conversation about medians and averages, I'd just direct the Court to the decision in Tijani, because Tijani forecloses. It's a decision of this Court. It forecloses their interpretation of Kim. It says 30 months is too long. So it's obviously imposing a temporal limit on the length of detention above and beyond whatever sort of theoretical limit there may be. And it's impossible to reconcile Tijani with the government's interpretation. It is also exactly contrary, the government's interpretation, to Judge Boggs' decision in Lai. And obviously, under their interpretation, he can be held forever. And that just can't be right. I do also think, with respect to alternative countries, just very briefly, Your Honor, I don't know what alternative country there would be, but this Court doesn't have to second-guess the authority of the district director or whoever in that regard, Your Honor. The question is whether it's reasonably foreseeable. So even if there could, in theory, hypothetically, be some third country that would pop up and offer to take him, that's not reasonably foreseeable. And as long as the government's position, the process by which DHS would try to identify a country besides Sri Lanka who would take him has not yet been triggered, because that won't begin until after the Attorney General makes a final decision on asylum. That's correct, Your Honor. But this Court... So we don't really know whether... I mean, the difference in Zavitas was that we knew that Cambodia or whatever country it was in those cases, Eastern Europe, would not take the aliens back, notwithstanding the fact that they were deportable based upon their aggravated felony convictions. Yes, Your Honor, but this Court can make the judgment about whether it's reasonably foreseeable now. Just as in Zavitas, negotiations weren't complete. The government argued that negotiations were ongoing with Vietnam and Cambodia. With respect to Mr. Zavitas, he's the one from Eastern Europe in the case, the Fifth Circuit had held, look, it's not necessarily over that Germany won't take him or that Lithuania won't take him. And the Court said, right, but now you can continue to negotiate, but we decide now if it's reasonably foreseeable. And I think this Court can look at the history of this case and see he's never lived in any other country and say it's not reasonably foreseeable now. The government can continue to try to negotiate whenever it feels it appropriate to do so. Third, with respect to constitutional avoidance, it can't be waived, even if I hadn't raised it in this Court. This Court would still be obliged to consider it. We cite two cases from the Supreme Court in our reply brief. It's Nice v. Southern Railway and Alma-Motor. They're in a footnote, but it's a kind of statutory construction. That's correct, Your Honor. It isn't waived anyway. The district court relied on Zavitas. And I quote the point in our reply brief. The district court was well aware that it could construe the statute as the Supreme Court had done in Zavitas. I want to make a couple points about whether he has any constitutional rights at all. First, even if Mazzai, the Supreme Court case, Mazzai and Barrera are entirely good law and he has no constitutional rights, okay, their interpretation still requires the indefinite detention of people who unquestionably do have constitutional rights because the statute governs all inadmissible aliens. And there's no doubt that at least some inadmissible aliens under the statute do have constitutional rights, even under Mazzai. If you enter the country without inspection, like an illegal border crosser, you could live here for up to two years and still be subject to the statute as the government interprets it. You could be expeditiously removed for that time period. And you're always an alien seeking admission, even if you live here for ten years. Those people undoubtedly have constitutional rights under a long set of case law and under Zavitas itself. But they're subject to indefinite detention under the government's interpretation. Similarly, a returning lawful permanent resident can be an alien seeking admission under some circumstances. Landon v. Plasencia is a 1982 Supreme Court case about that. It says they have due process rights. And so the government's interpretation, again, authorizes the indefinite detention of people who have constitutional rights. The second thing I want to say about that is, you know, our briefing is fairly clear on why we think Zavitas has been undercut. Sorry, Zavitas has undercut Mazzai. I just want to note that the Sixth Circuit in Rosales-Garcia, on bank, said that Mazzai's constitutional force is no longer sufficient to authorize indefinite detention. And so it's obviously a serious constitutional problem whether or not Mazzai survives, its rationale survives Zavitas. And so I don't think this Court should address it. I mean, maybe the Supreme Court will have to address it at some point, but you can easily avoid that by construing the statute. In addition, this Court in Wong v. INS, it says that excludable aliens have rights under the Fifth Amendment. And it reads Mazzai as only being about procedural rights, which I guess is similar to something that you had said earlier, Judge Tallman, reading Mazzai as about procedural rather than substantive claims. These are all different ways that the Court could do it, but I don't think that the Court has to address that question. It clearly is a serious constitutional question, and this Court should avoid it. A few other things briefly. I'd just like to remind the Court again that Marzack v. Green is a Tenth Circuit case on the subject of the nature of the facially legitimate and bona fide standard. It reviews all the cases or a lot of the cases, including this Circuit's cases, and says, look, we do do some record review. So whether it's the bona fide prong that we're doing it under or whether it's, you do do some record review. If you look at Barrera and you look at Alvarez-Mendez, the Court looks and says, yeah, these are criminal convictions. It is true that this person has a really serious dangerousness problem. And here it just wouldn't hold up the same way. Two last things. I really would request a ruling on the motion if the Court believes that we're likely to succeed on the merits. That psychiatric report in the record is from September of 2004. And it's been a long time since then and it hasn't gotten better. And I would just really request that the Court rule on the motion. If the Court is inclined to grant relief in this case, that it find a way to do so quickly for my client's sake. And I do think there is something, the government invokes the specter of post-9-11 world. We all live in that world. But there's something troubling about the idea that my client was repeatedly tortured in Sri Lanka because of very bad evidence that he was a member of the LTTE, which was false. He's a farmer from Sri Lanka. He's not a terrorist. Now he's come to this country. Of course, we haven't tortured him. But he's been detained for four and a half years on the same kind of really bad evidence. And it can't just be that putting the T word in the air and saying terrorism is enough to detain somebody for four and a half years. And if the Court doesn't have any further questions. Thank you. Thank you for your argument. Thank you both for your arguments. It's obviously an important and interesting case and the Court will take it under advisement. We'll be in recess.
judges: Thomas, Tallman, Fitzgerald